# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT P. FLAHERTY,   d/b/a GREEN
VALLEY LANDSCAPING,**
    Debtor

Chapter 7
Case No. 03-19751-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MIDDLESEX SAVINGS BANK,**
    Plaintiff
v.
**ROBERT P. FLAHERTY, d/b/a GREEN
VALLEY LANDSCAPING,**
    Defendant

Adv. P. No. 04-1087

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by the Middlesex Savings Bank

(the "Bank") against the Debtor, Robert P. Flaherty, d/b/a Green Valley Landscaping (the

"Debtor"). Through its Complaint, the Bank seeks a determination that a debt in the sum

of $66,728 owed to it by the Debtor is nondischargeable in the Debtor's bankruptcy case.

The Bank alleges that the Debtor obtained credit from it by the use of a statement in

writing which was false as to the assets and financial condition of Green Valley Landscaping Inc. ("Green Valley), a corporation in which the Debtor was the principal.

Specifically, in its Complaint, the Bank alleged that the Debtor, as president and 100% owner of Green Valley, obtained a loan by providing it with a false financial statement in which he represented that Green Valley owned various assets, including landscaping equipment with a value of $59,172, as well as certain vehicles. According to the Bank, these representations were false as the landscaping equipment was not owned by Green Valley. In reliance on these representations, the Bank alleged that it granted Green Valley a $20,000 loan in the form of a revolving line of credit and an $82,5000 term loan. The Bank further alleged that the parties agreed that the line of credit would be secured by a security interest in all of Green Valley's business assets and that the term loan would be secured by three vehicles held in the Debtor's name, individually. The Bank alleged that the Debtor personally guaranteed its loans to Green Valley and that it perfected its lien with respect to the corporate assets. The Bank stated that it only perfected its lien with respect to one of the vehicles owned by the Debtor, which it sold, realizing net proceeds of $18,966. After applying the proceeds to the loans, the Bank alleged that it is owed $66,728.30

Based upon these allegations, the Bank sought a declaration that the debt guaranteed by the Debtor is nondischargeable pursuant to "section 523(a)(2) of the Bankruptcy Code." In its prayer for relief, the Bank also sought orders requiring the Debtor to disclose to the Bank all accounts receivable of Green Valley and to pay to the

2

Bank certain receivables of Green Valley, as well as attorneys' fees.

Although the Bank failed to reference a particular subsection of § 523(a), the Court shall construe the Complaint as a request to except the debt from discharge pursuant to both subsections 523(a)(2)(A) and 523(a)(2)(B), even though the thrust of the Complaint set forth allegations pertaining to the exception based upon a false financial statement, because the parties, in their Joint Pretrial Memorandum, stated that the issues were whether the debt was nondischargeable under both subsections 523 (a)(2)((A) and (a)(2)(B).[1] Moreover, at the commencement of the trial in this proceeding, the Court questioned counsel to the Bank with respect to the claims set forth in the Complaint. Counsel to the Bank responded that the Bank made claims under § 523(a)(2)(A) and § 523(a)(2)(B); counsel to the Debtor did not object. Therefore, the Court shall evaluate the Bank's claims under both subsections of §523(a)(2).

The Debtor filed an Answer in which he generally denied the allegations set forth in the Complaint and further asserted a number of defenses, including that he was unaware that the assets he represented were owned by Green Valley had not been transferred to the corporation and that the financial statement submitted to the Bank was inaccurate. As a further defense, he contended that the Bank did not rely on the financial statement in extending credit and, instead, relied upon its business relationship with his accountant at the time, Michael O'Keefe ("O'Keefe").

---

[1] The Joint Pretrial Memorandum was signed by counsel to both the Plaintiff and the Defendant.

3

With respect to the Bank's request that he turnover accounts receivable, the Debtor stated that collected funds were used to pay corporate obligations and that he would provide a list of receivables to the Bank.  The Debtor further asserted that the Bank failed to asset a proper claim under § 523(a) with respect to his conduct and Green Valley's receivables.

The Court conducted a trial on August 10, 2005 at which three witnesses testified and ten exhibits were introduced in evidence.  Both parties submitted post-trial requests for findings of fact.  Based upon the evidence presented, including the testimony and exhibits, the Court makes the following findings of fact and conclusions of law as required by Fed. R Bankr. P. 7052.

## II. FACTS

The Debtor, who testified that his had been in the landscaping business for approximately 14 years, filed a voluntary Chapter 13 petition on November 24, 2003. Approximately one month later, on December 22, 2003, he converted his Chapter 13 case to a case under Chapter 7 and simultaneously filed his Schedules and Statement of Financial Affairs.  On Schedule B-Personal Property, he listed ownership of 100% of the stock of Green Valley, as well as a joint claim with Green Valley for "malfeasance and negligence against CPA Michael O'Keefe of Millis, MA."  Additionally, he listed various trucks worth a total of $31,250[2] and equipment used in his landscaping business, including

---

[2] Specifically, he listed a 2001 GMC Sierra truck, a 2002 GMC Envoy, a 1986 Chevrolet dump truck, a 1988 GMC truck, a 1993 Ford Ranger, a 1995 Chevrolet van, and a 1999 Ford F250 truck.

mowers, dethatchers, and blowers, with a total value of $5,000.

At all pertinent periods of time to the above-captioned adversary proceeding, the Debtor was the president and one hundred percent owner of the stock in a Massachusetts corporation, Green Valley, which was incorporated in 2001. The Debtor operated a landscaping business through Green Valley and employed his sister as the corporation's bookkeeper. According to the Debtor, the business generated gross revenue of about $600,000 and had 17 employees and 250 customers at its peak in 2002.

In early 2002, the Debtor sought to obtain credit for the purpose of consolidating credit card debts and expanding his business. He investigated loan opportunities at three banks: Strata Bank, Milford Federal and Middlesex Savings Bank. Strata Bank rejected his application, although Green Valley had done business with it for approximately seven years; Green Valley did not submit an application to Milford Federal after speaking with its representatives. The Debtor testified that he was referred to Middlesex Savings Bank by his accountant, O'Keefe.

In March of 2002, Green Valley submitted a corporate loan application to Middlesex Savings Bank. The Debtor executed the application as an officer of Green Valley. In the application, the Debtor, on behalf of Green Valley, requested a loan $125,000 and offered vehicles, equipment and receivables as collateral. The Debtor's sister completed the loan application, although the Debtor's signature as an officer appears on the application. The Debtor authorized his sister to sign the application using a stamp facsimile of his signature, and he intended the stamp to be effective as his signature.

5

The Debtor supplemented the loan application with a number of documents, including a list of equipment with depreciated valuations and a balance sheet, which contained a list of fixed assets, including an "AUTO-Volvo" worth $25,374.75, landscaping equipment worth $59,172, a truck worth $35,000, and a "Truck-250" worth $20,593 for a total value of $140,139.75. In a so-called Depreciation and Amortization Report, the Debtor listed various pieces of landscaping and other equipment, including a dump truck with an unadjusted cost or basis of $8,395, a 1993 Ford Ranger with an unadjusted cost or basis of $10,900, a truck with unadjusted cost or basis of $3,100, another truck with an unadjusted cost or basis of $4,650, a third truck with an unadjusted cost or basis of $4,200, and a 1999 Ford F-250 with an unadjusted cost or basis of $20,593. The total unadjusted cost or basis of the vehicles and equipment was shown to be $122,157.

In addition, the Debtor submitted a letter to the Bank for the purpose of obtaining the loan for Green Valley. In the letter, he portrayed the business as successful and growing, promised future business with the Bank, and forecasted growth in sales. In an attached memo entitled "where is the risk?" he further represented that Green Valley had $190,000 worth of equipment, excluding three trucks. He added: "This is what we feel the resale value would be." In these documents, the Debtor expressly represented that the corporation owned landscaping equipment; the logical conclusion being that the three trucks were not owned by the corporation.[3]

---

[3] The Court takes judicial notice that title to vehicles is readily available by researching the Massachusetts Registry of Motor Vehicles.

6

The Debtor offered all of Green Valley's assets as collateral for the loan. On the application, he indicated that all tax liabilities were "settled for the year 2001," although he conceded at trial that there were "open tax issues" at the time of the application.

In a letter dated October 25, 2002, the Internal Revenue Service notified the Debtor that he owed employee withholding taxes for 2000 and 2001 totaling $12,891.[4] Although the notice was sent to sent to him personally, the tax obligation pertained to witholding taxes for employees of Green Valley as the corporations's employer tax ID number of 04-3326971 appeared on the notice.

At the time of the loan application, Green Valley did not own the equipment. Although the Debtor owned the equipment, he testified that he did not realize that he had not transferred the assets to his corporation.

Based upon Green Valley's loan application and the supporting documents submitted to it by the Debtor, the Bank approved a term loan of $82,500 and a revolving line of credit for $20,000, on condition that Green Valley grant a security interest in all its assets. The Bank issued a commitment letter on July 1, 2002 in which it agreed to extend the line of credit "secured with a first security interest in all business assets," specifically the equipment, which the Debtor testified he thought was owned by the corporation. The Bank agreed to extend the term loan on condition that it would be secured by the three vehicles owned by the Debtor: a 2000 Volvo, 1999 Ford F250, and a 2001 GMC pickup

---

[4] On Schedule E-Creditors Holding Unsecured Priority Claims, the Debtor listed the IRS as the holder of a claim for "941 trust fund taxes assessed before 2001" in the sum of $9,000.

truck.[5]  Although Green Valley was not executing a real property mortgage, the Bank, in

its commitment letter, stated that as a condition of the credit availability, Green Valley

would be required to provide proof of insurance naming the Bank as loss payee on all real

property pledged to it.  The Bank in its commitment letter further stated:  "[t]he Bank's

attorney shall approve each instrument or document required to be furnished by the

Borrower pursuant to the commitment . . . [and] . . . [t]he Bank or its attorney may require

further instruments, documents and assurances as may be determined prior to or at the

closing."  It also indicated that its closing attorney would be Michael G. Gatlin.  On August

1, 2002, the Bank filed a UCC-1 financing statement with respect to the assets of Green

Valley.

One week after the Bank issued the commitment letter, the Debtor, as president of

Green Valley, and individually, executed the commitment letter as did the Bank's officer,

Bruce A. Miccile.  On July 30, 2002, Green Valley and the Bank executed a Loan and

Security Agreement.  The Debtor executed the document as the duly authorized president

of Green Valley.  The agreement provided that $82,500 would be used to pay off existing

debt to various motor vehicle finance companies, and $20,000 would be used for working

capital.  The agreement provided that Green Valley would grant the Bank a first priority

security interest in all assets of the business.   In the agreement, Green Valley represented

that it had "good and clear record and marketable title to all of its assets subject only to

liens, encumbrances, security interests and charges, to all property and assets reflected in

---

[5] The Bank listed the vehicle identification numbers associated with the vehicles.

its financial statements and to property and assets since acquired, except property and assets subsequently disposed of in the ordinary course of business." Additionally, Green Valley executed a Revolving Line of Credit/Demand Note and a Term Promissory Note, and the Debtor also executed a personal guaranty of the corporation's loan.

Although at the trial the Debtor testified that he believed that he originally held title to the equipment but that he transferred it to Green Valley at the time it was incorporated, neither he nor the Bank introduced in evidence any bills of sale or title documents with respect to the landscaping equipment. In his answers to interrogatories, the Debtor stated that it was the intention for Green Valley to own the equipment, and that the failure to transfer the assets to it when it was incorporated was unintentional and inadvertent. The Debtor conceded that Green Valley did not own the property which it pledged it to the Bank as collateral. According to the Debtor, he did not become aware that the assets did not belong to Green Valley until immediately before he filed his individual bankruptcy petition, at which time, on Schedule B, he listed the equipment used in Green Valley's landscaping business as his personal assets.

The Court finds that the Debtor's testimony to be unreliable because of inconsistencies in his testimony and conduct. In particular, the Debtor made inconsistent statements about the ownership of the equipment at various times. At one point, he stated that he believed the assets were transferred to Green Valley at the loan closing. At another time, he said that the transfer was to have taken place when Green Valley was incorporated. In his bankruptcy schedules, he represented that he owned the assets

9

individually. The Debtor's testimony that he did not realize that the assets were not owned by Green Valley is not credible because of the inconsistencies between his testimony at trial, statements in his bankrutpcy schedules, in which he claimed that the assets were his own, responses to discovery, and representations to the Bank during the loan application process. As the sole shareholder and president of Green Valley, it is inconceivable that the Debtor was unaware of who owned the assets. Moreover, other portions of his testimony at trial were evasive and incredible - - in particular, his testimony that his accountant was instrumental in obtaining and negotiating the loan on behalf of Green Valley.

In addition to his inconsistent statements as to ownership of the landscaping equipment, the Debtor made a materially false statement to the Bank about the status of tax liabilities. At trial, when confronted about the falsity of his representation that all tax issues were resolved in 2002, which was in fact untrue, the Debtor was evasive, responding "I don't know how to answer that."

The Debtor's accountant, O'Keefe, testified that he was acquainted with Miccile, the Bank officer, from his son's sport's team in their community. He stated that he and Miccile were not friends, only acquaintances, that he did not introduce the Debtor to representatives of the Bank, that he did not arrange the loan, that he did not compile the documents for the loan application, and that he did not set up meetings between the Bank and the Debtor. O'Keefe's testimony on his limited involvement with the Bank loan was credible.

The Bank officer, Miccile, corroborated that he was not a personal friend of O'Keefe.

10

Additionally, Miccile testified that the loan would not have been approved without the collateral. He conceded that he had some business referrals from O'Keefe, but he testified that O'Keefe did not participate in the loan negotiations. Miccile testified that he relied on the documents supplied to him by the Debtor on behalf of Green Valley and on the Debtor's oral and written statements that Green Valley owned the collateral. Miccile testified that in granting the loan the Bank relied on the representation that the corporation owned $190,000 worth of equipment. At a meeting with the Debtor, Miccile reviewed Green Valley's tax returns. According to Miccile, at that meeting the Debtor represented that the company's tax liabilities were current. In view of this testimony, the Court finds that the Bank did not rely on its relationship with O'Keefe in approving this loan, and instead relied on the Debtor's representations about his business and its value in extending credit to Green Valley.

Miccile testified that the Bank did not inspect the equipment. Additionally, there was no evidence that it obtained an appraisal or any documentation concerning the ownership of the equipment. According to Miccile, the Bank left the determination or documentation with respect to the ownership of the equipment up to the closing attorney. There was no evidence of actions, if any, taken by the attorneys for the Bank, to investigate the ownership or value of the collateral. There was no evidence that the Bank or its agents did anything to confirm that Green Valley owned the equipment or that it made any inquiry with respect to the equipment being offered as collateral for the loan. The Bank apparently relied primarily upon the representation contained in the Loan and Security

11

Agreement that Green Valley had good title to all of the assets reflected in its financial statements.

The Bank perfected a lien on only one of the vehicles, the GMC pickup. It did not perfect a lien on the Volvo or Ford F150, which were owned by the Debtor personally, and were not owned by Green Valley. The Bank repossessed the GMC pickup truck and credited the Debtor with $18,966 after its sale.

The Court finds that the Bank was careless in documenting its security with respect to this loan. It did not perfect its lien in two of the vehicles, and there was no evidence that it did anything to verify that the corporation owned the equipment or that the collateral was sufficient in value to secure the loan. Miccile conceded that the Bank did not do a physical inspection or appraisal and left the equipment issues up to the Bank's attorney. The only evidence as to the Bank's diligence with respect to the loan to Green Valley was Miccile's two meetings with the Debtor to review Green Valley's application, supporting documentation, and tax returns.

The Court also finds that Green Valley was an insider of the Debtor. If a debtor is an individual, an insider includes a "corporation of which the debtor is a director, officer, or person in control." *See* 11 U.S.C. § 101(31)(A). As the sole shareholder and president of Green Valley, the Debtor was an insider of Green Valley.

## III. DISCUSSION

A. <u>Applicable Law</u>

In proving an exception to discharge under § 523(a), the creditor must prove each

and every element of its case by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498

U.S. 279, 286 (1991); <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 787 (1st Cir. 1997)("The burden

of proof and the burden of production as to each element rests with the party contesting

the dischargeability of a particular debt under Bankruptcy Code § 523."). Moreover, as the

court stated in <u>Palmacci</u>,

> "Exceptions to discharge are narrowly construed in furtherance of the
> Bankruptcy Code's 'fresh start' policy," and, for that reason, the claimant
> must show that his "claim comes squarely within an exception enumerated
> in Bankruptcy Code § 523(a)." <u>Century 21 Balfour Real Estate v. Menna (In
> re Menna)</u>, 16 F.3d 7, 9 (1st Cir. 1994); <em>see</em> <u>In re Bajgar</u>, 104 F.3d at 498 n. 1.
> The statutory requirements for a discharge are "construed liberally in favor
> of the debtor" and "[t]he reasons for denying a discharge to a bankrupt must
> be real and substantial, not merely technical and conjectural." <u>Boroff v. Tully
> (In re Tully)</u>, 818 F.2d 106, 110 (1st Cir. 1987) (internal quotation marks
> omitted).  On the other hand, we have noted that "the very purpose of
> certain sections of the law, like [§ 727(a)(2) ], is to make certain that those
> who seek the shelter of the bankruptcy code do not play fast and loose with
> their assets or with the reality of their affairs." <u>Id.</u> Likewise, other sections of
> the law, like § 523(a)(2)(A), are intended to make certain that bankruptcy
> protection is not afforded to debtors who have obtained property by means
> of a fraudulent misrepresentation.

<u>Palmacci v. Umpierrez</u>, 121 F.3d at 786.

Section 523(a)(2)(A) excepts from discharge liabilities for money or an extension of

credit obtained by false pretenses, a false representation or actual fraud, *other than a*

*statement respecting the debtor's or an insider's financial condition.*    11 U.S.C. §

523(a)(2)(A)(emphasis supplied).  According to the First Circuit, "[u]nder the traditional

common law rule, a defendant will be liable if (1) he makes a false representation, (2) he

does so with fraudulent intent, i.e., with 'scienter,' (3) he intends to induce the plaintiff to

rely on the misrepresentation, and (4) the misrepresentation does induce reliance, (5) which

13

is justifiable, and (6) which causes damage (pecuniary loss). Id. (citations omitted).[6]

To fall within the exception to discharge under § 523(a)(2)(A), the misrepresentation must have been knowingly and fraudulently made and must have related to a material fact. Moreover, the creditor must have relied on the misrepresentation.  There are two aspects to reliance: actual reliance and justifiable reliance.  The creditor must have actually relied on the misrepresentation, and that reliance must have been justifiable under the circumstances.  See Lentz v. Spadoni (In re Spadoni), 316 F.3d 56 (1st Cir. 2003).  In Spadoni, the First Circuit discussed the requirement of reliance:

> "'Reasonable reliance'--measured by an objective standard--is a requirement under various doctrines. See, e.g., Restatement (Second) of Contracts § 139 (1981) (reliance must be reasonable in a contract action). However, the Supreme Court has held that a less demanding 'intermediate' standard, which it calls 'justifiable reliance,' applies under section 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 73-74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  In particular, the Court said that the circumstances of the reliance claim must be taken into account and that the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood). See id. at 71, 116 S.Ct. 437.

316 F.3d at 59.

The exception to discharge under § 523(a)(2)(A) does not deal with deception by means of a statement relating to the debtor's or an insider's financial condition, which is the subject of section 523(a)(2)(B).  Section 523(a)(2)(B) provides that a "discharge under section . . .727 . . . of this title does not discharge an individual debtor from any debt for

---

[6] The First Circuit noted that in Field v. Mans, 516 U.S. 59 (1995), the Supreme Court construed § 523(a)(2)(A) to incorporate the general common law of torts. Id. at 786 n. 2.

14

money, property, services, or an extension, renewal, or refinancing of credit, to the extent

obtained, by use of a statement in writing that is materially false; respecting the debtor's

*or an insider's financial condition*; on which the creditor to whom the debtor is liable for such

money, property, services, or credit reasonably relied; and that the debtor caused to be

made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B) (emphasis added). *See*

In re Coughlin, 27 B.R. 632, 635-36 (B.A.P. 1st Cir. 1983).[7]

Section 523(a)(2)(B) pertains to a specific type of financial statement, "one that

specifically states a debtor's or insider's net worth. City Fed. Savs. Bank v. Seaborne (In

re Seaborne), 106 B.R. 711, 713 (Bankr. M.D. Fla. 1989)(citing Brigadier Homes & U.S.

Homes Acceptance Corp. v. Hert, 81 B.R. 638 (Bankr. N.D. Fla. 1987)). The financial

statement does not need to be a formal document produced by commercial or banking

institutions. Nevertheless, it must describe the financial condition of the debtor or an

insider of the debtor. Seaborne, 106 B.R. at 714 (citing Household Finance Corp. v. Howard

(In re Howard), 73 B.R. 694, 702 (Bankr. N.D. Ind. 1987), and Butler v. Roberts (In re

Roberts), 54 B.R. 765, 770 (Bankr. N.D. 1985)).

Section 523(a)(2)(B) requires the creditor to prove that it reasonably, as opposed to

justifiably, relied on the written statement at issue. In Field v. Mans, the Supreme Court

discussed the reason for requiring a greater burden of proof on creditors seeking to except

---

[7] Thus, under § 523(a)(2)(B), the Bank was required to proved the following six
elements in order to obtain a finding of nondischargeability: "(1) a debt for obtaining
money, 2) by use of a statement in writing, 3) that is materially false, 4) respecting the
debtor's financial condition, 5) on which the creditor reasonably relied, and 6)
published by the debtor with intent to deceive."

their claim from discharge under § 523(a)(2)(B) than those relying on § 523(a)(2)(A). It stated:

> The House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.

516 U.S. at 76-77.

A determination of whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Lease Corp. of Amer. v. Harloff (In re Harloff), 272 B.R. 496, 500 (Bankr. M.D. Fla. 2001). According to the court, in Harloff,

> [a]mong the circumstances that might affect the reasonableness of a creditor's reliance are (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

Id. (citing BancBoston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556, 1560 (6th Cir.1992), cert. denied, 507 U.S. 916 (1993), and Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166-67 (6th Cir.1985)).

    B. Analysis

        1. Section 523(a)(2)(A)

Evaluating the evidence in relation to the elements of the cause of action under subsections 523(a)(2)(A), the Court finds that the Bank failed in its burden of proof. Although the Debtor made false representations as to the assets being offered as collateral to the Bank for its loan to Green Valley, in his capacity as its president, Green Valley, not the Debtor, obtained the extension of credit. The Debtor represented that Green Valley owned the collateral, when he knew that statement to be false.  As the owner of the collateral and the owner of Green Valley, this Court finds that the Debtor knew the falsity of the representation.  This finding is based on the inferences raised by the Debtor's lack of credibility - -specifically, his inconsistent statements which he made about the assets at various times before and during this litigation.  The evidence establishes that the Debtor made false representations to the Bank about the collateral with the intent to deceive the Bank and for the purpose of obtaining the loan.  The Bank sustained damages as a result of the Debtor's conduct,  namely its inability to collect the debt from Green Valley or the Debtor.  The Debtor, however, did not obtain the extension of credit, which was granted to Green Valley.   Furthermore, the Debtor's false representations were statements respecting the financial condition of Green Valley, and thus  do not fall within the exception to discharge under section 523(a)(2)(A), which proscribes false statements other than statements respecting the debtor's or an insider's financial condition.

2. Section 523(a)(2)(B)

With respect to the plaintiff's proof under section 523(a)(2)(B), the Court finds that the Bank again failed in its burden of proof.  The Debtor 's loan application, including the

17

supporting documents, were statements in writing, that were materially false, due to the Debtor's misrepresentation of "an insider's financial condition," namely the financial condition of Green Valley. The loan application was materially false as the Debtor stated that the collateral was owned by the corporation when it was not. The Debtor used these statements to obtain the loan from the Bank. The application and supporting documentation were financial statements purporting to state material facts concerning the Green Valley's ability to repay the loan and the Bank's risk in extending credit. Moreover, the Bank actually relied on the statements produced by the Debtor on behalf of Green Valley in extending it credit.

Although the Court is persuaded that Bank actually relied on the Debtor's false representations and false financial statement, the Court finds that the Bank did not reasonably rely on the Debtor's statements. It was not reasonably prudent with respect to establishing the ownership and value of the collateral. Its reliance on the Debtor's mere statements and representations contained in the Loan and Security Agreement, without some independent verification, was not commercially reasonable. This is especially true in light of the fact that there had been no previous business dealings between the Debtor and the creditor.

The Debtor did not have a prior or personal relationship with any of the Bank's agents or representatives, and his relationship with O'Keefe, and O'Keefe's relationship with the Miccile, did not establish the type of commercial banking association that would have permitted the Bank to rely on the Debtor's representations without a modicum of due

18

diligence. The Court finds that the disparate valuations of the collateral offered to the Bank as security should have raised a "red flag" at least as to its value, particularly given the nature of the equipment, trucks and lawn and gardening equipment subject to heavy use. Moreover, a minimal investigation would have revealed the inaccuracy of the Debtor's representations, at least with respect to the motor vehicles.

The Bank failed to introduce evidence that it did anything to investigate the ownership of the offered collateral - - it did not request bills of sale or other documentation. There were warnings signs that the company did not own the collateral. In fact, several vehicle were titled to the Debtor personally. To repeat, a minimal investigation would have uncovered the inaccuracies in both the Debtor's representations about the collateral and false statements in the application as Green Valley would have been unable to present evidence of ownership of the equipment and the vehicles. With respect to its burden under § 523(a)(2)(B), the Court concludes the Bank failed to establish the reasonableness of its reliance on the false financial statement submitted to it by the Debtor on behalf of Green Valley. Accordingly, the Bank is not entitled to costs and attorneys' fees in this matter. The Court need not address the Bank's request, contained in its prayer for relief, for disclosure and payment of certain Green Valley accounts receivable as such request fails to state a claim for exception to discharge.

## IV. CONCLUSION

In the absence of proof on each and every element of its claims under subsections 523(a)(2)(A) and523(a)(2)(B), the Court determines that the debt should not be excepted

19

from discharge.  The Court shall enter judgment in favor of the Debtor and against the

Bank in this adversary proceeding.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: October 13 , 2005
cc: William M. Zall, Esq., George R. Desmond, Esq.